**Stanley Wayne FOWLER, Petitioner,**

v.

**William D. LEEKE, and The Attorney General of The State of South Carolina, Daniel R. McLeod, Respondents.**

Civ. A. No. 79–293.

United States District Court,
D. South Carolina,
Columbia Division.

Sept. 14, 1979.

**HEMPHILL, Senior District Judge.**

This § 2254 case is before the court on a motion for summary judgment by the respondents, to which the petitioner has responded after receiving an explanation of summary judgment procedure.

The petitioner was convicted of armed robbery in the Greenville County Court, and Judge James H. Price, Jr., sentenced him to prison for twenty years. A timely notice of intention to appeal the judgment of conviction was filed. The petitioner retained a new attorney to substitute for counsel he retained to defend him on the robbery charge.[1] During the pendency of the appeal, a motion for a new trial was made, based on after-discovered evidence in the form of a confession by one Wayne Hughes that he committed the robbery for which the petitioner was convicted and sentenced. Judge Price heard the motion on September 12–13, 1974, and on October 3, 1974, he

entered an Order denying the motion. The petitioner appealed to the Supreme Court of South Carolina, which affirmed the conviction and upheld the denial of a new trial in *State v. Fowler*, 264 S.C. 149, 213 S.E.2d 447 (1975).

On May 20, 1976, the petitioner initiated a post-conviction application to the Court of Common Pleas for Greenville County. His alleged grounds for relief were: (1) that his identification in court by the robbery victim was tainted because of an illegal showup before trial; (2) that his motion for a new trial should have been granted; (3) that certain evidence he proffered during his motion hearing was erroneously excluded by Judge Price; (4) that a key prosecution witness should have been present to testify at his robbery trial; and (5) that officers failed to read him his rights following his arrest. The post-conviction case was set for a hearing on November 10, 1976 before Judge Julius H. Baggett at Greenville after counsel was appointed for the petitioner. Before the date set for the hearing, the petitioner escaped from the custody of the South Carolina Department of Corrections, thereby making it impossible for the Court of Common Pleas to hear his testimony in support of his various claims for relief under the Post-Conviction Procedure Act of South Carolina. Even though the petitioner was not personally present for the hearing because of his intervening crime of escape from lawful custody,[2] Judge Baggett reviewed the records of his trial and the hearing on the motion for a new trial, and the appeal record, and he entered an Order dismissing the application for post-conviction relief on November 27, 1976. Judge Baggett based the dismissal on two reasons. He found the petitioner's various grounds for relief "to be totally devoid of merit."

1. Jack H. Lynn defended Fowler at his trial on April 18–19, 1974. William B. Long, Jr., was thereafter retained to succeed Lynn as petitioner's attorney. Both of these men are experienced criminal trial lawyers.

2. Fowler has a § 1983 case pending on a motion for summary judgment. In that case, *Fowler v. Leeke*, Civil Action No. 79–1321, he seeks a change in the computation of the expi-

ration date of his sentence on prison records. The pleadings reveal that he escaped on October 30, 1976, and remained at large outside South Carolina until he was returned to prison on June 1, 1978, after extradition from Florida. He was at large for nineteen months, and he was sentenced for the crime of escape on February 2, 1979, after pleading guilty.

Alternatively, he found and concluded that Fowler, by willfully escaping from custody and removing himself illegally from the court's jurisdiction, after invoking its jurisdiction to seek post-conviction relief, had "frustrated the administration of justice," and had "waived and abandoned his contentions and request for relief."[3]

After his capture and return to prison, Fowler submitted a second application for post-conviction relief to the Court of Common Pleas on or about October 11, 1978, and amended it on December 11, 1978. In this application, Fowler alleged: (1) that he was the subject of an illegal lineup; (2) that he lacked the ineffective assistance of counsel

at his trial; and (3) that four other persons had been charged with the robbery for which he had been convicted. Judge Price (now a circuit judge) denied and dismissed the application in an Order entered on January 8, 1979. He held that claims (1) and (3) had been fully considered and rejected by Judge Baggett in the earlier Order, and that the claim of ineffective assistance of counsel was barred by the successive petition rule contained in the Post-Conviction Procedure Act of South Carolina.[4] Judge Price relied substantially upon *Hunter v. State*, —— S.C. ——, 244 S.E.2d 530 (1978), in his summary dismissal of the later post-conviction case.

**3.** In support of his conclusion that Fowler had waived his right to seek post-conviction relief under the South Carolina statute, Judge Baggett relied upon *Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970), and cases in Wisconsin and Indiana. While the question of the effect of an escape pending a collateral attack by an escaped prisoner on his conviction is one which has a relatively recent origin, it has long been established that a prisoner forfeits a direct appeal of his conviction if he escapes while his appeal is pending. *Allen v. Georgia*, 166 U.S. 138, 17 S.Ct. 525, 41 L.Ed. 949 (1897), which is cited in *Molinaro*, outlines clearly a justification for the rule of law it applied in rejecting the appeal of a death sentence by a fugitive escapee. There is no readily apparent reason to apply the rule less stringently to collateral attacks at the trial court level than to direct appeals at an appellate level, particularly when it is kept in mind that habeas corpus traditionally has been regarded as governed by equitable principles. See *Sanders v. United States*, 373 U.S. 1, at 17–18, 83 S.Ct. 1068, 1078–1079, 10 L.Ed.2d 148 (1963).

In *United States v. Haley*, 417 F.2d 625 (4th Cir. 1969), a federal prisoner convicted of escape appealed his conviction, claiming as one ground that he should not be guilty of escape because he had been confined on an illegal conviction. The court stated that "[s]elf help in the form of escape . . . is indefensible." *Haley* was quoted in *United States v. Powell*, No. 78–6433 (4th Cir., July 11, 1979), which affirmed the denial of a motion to vacate a federal sentence for escape based on the appellant's claim that certain conditions at the prison justified his escape.

In *Arnold v. Faulkner*, No. 77–8313 (4th Cir., March 21, 1978), a West Virginia prisoner appealed a denial of his request for federal relief under 28 U.S.C. § 2254 by Judge Knapp of the Southern District of West Virginia. When the case was presented for a decision by the Court of Appeals, the prisoner had escaped. The court observed:

" * * * [A]lthough Arnold is currently in federal custody, as he has escaped from the punishment imposed for the conviction he now seeks to challenge, we find him 'disentitle[d] * * * to call upon the resources of the Court for determination of his claims.' " [Citing *Allen*, *Molinaro*, and *Estelle v. Dorrough*, 420 U.S. 534 [95 S.Ct. 1173, 43 L.Ed.2d 377] (1975).]

A similar result was reached in *Moore v. McKenzie*, No. 77–8055 (4th Cir., November 15, 1978).

The foregoing cases support the validity of Judge Baggett's conclusion that Fowler's deliberate act of escape represented an effective and knowing forfeiture of his application for post-conviction relief.

**4.** Section 17–27–90 of the Code of Laws of South Carolina (1976) requires an applicant for post-conviction relief to raise all grounds for relief in his original, supplemental, or amended application. Any ground not raised is waived, and cannot be raised in a later case unless the court finds a "sufficient reason" is shown for the successive application. In referring to a similar requirement in a Maine statute, the Supreme Court stated in *Murch v. Mottram*, 409 U.S. 41, at 45–46, 93 S.Ct. 71, at 73–74, 34 L.Ed.2d 194 (1972):

" * * * No prisoner has a right either under the Federal Constitution or under 28 U.S.C. § 2241 to insist upon a piecemeal collateral attack on a presumptively valid criminal conviction in the face of such a statutory provision. * * * "

See also *Sanders v. United States, supra*, 373 U.S. pp. 17–18, 83 S.Ct. 1078, where, in referring to governing equitable principles in habeas corpus, Mr. Justice Brennan observed, " * * * [A] suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks. * * * "

Fowler now seeks federal relief under 28 U.S.C. § 2254, based on a combination of all grounds he has previously raised in his appeal and the two applications for post-conviction relief. The respondents base their motion for summary judgment on the records of the petitioner's trial, his motion for a new trial, and his appeal, and on the Orders by Judge Baggett and Judge Price denying the petitioner's applications for post-conviction relief.[5] The petitioner's response to the motion, in opposition thereto, is contained in his "petition" and "motion to correct . . . sentence," both filed on May 16, 1979. The petition erroneously characterizes this action as a "removed" criminal prosecution, and requests bail.[6] The motion is a restatement of the petitioner's grounds, supported by several pages of argument.

The respondents concede that the petitioner has exhausted all remedies available to him in the courts of South Carolina, but they allege that none of his grounds are meritorious under § 2254. The respondents isolate from their detailed rebuttal of the petitioner's ten grounds his claim of ineffective assistance of counsel, and as to that claim, which was barred by Judge Price under the successive petition—waiver rule of South Carolina, respondents urge that petitioner by-passed a state remedy by not seasonably raising this ground in his initial *pro se* application for post-conviction relief, which Judge Baggett denied. Respondents cite *Murch v. Mottram, supra,* in support of their contention that a by-pass has occurred,[7] but they also urge that, in any event, the petitioner's claim that he was deprived of the effective assistance of counsel is unsupported by the record of his trial.

Apart from a consideration of the merits of the various grounds for relief alleged by the petitioner, this case presents two troublesome issues that must be addressed. The first question is whether the petitioner's escape when a hearing in his initial post-conviction case was imminent represents a by-pass that justifies a rejection of all federal claims that were raised by him in that case. The second question is whether a state remedy to test petitioner's claim of ineffective counsel was by-passed or waived by him because he failed to assert the claim in his first application for post-conviction relief, which he abandoned by escaping. The veritable deluge of collateral attacks now being made by state prisoners on their convictions requires that such questions must not be dealt with lightly if the principle that criminal judgments must become final at some point in time is to continue to have meaning in this nation.[8]

---

**5.** The respondents have filed copies of the Transcript of Record on appeal to the Supreme Court of South Carolina, the briefs filed in the appeal, and the Orders of Judge Baggett and Judge Price dismissing Fowler's applications for post-conviction relief. The Order denying a new trial is in the Transcript of Record at pages 11–19. Transcripts of both the trial and the hearing on the motion for a new trial are in the voluminous compilation of the record, with separate paginations.

**6.** Even if Fowler qualified for bail in a collateral attack of his robbery conviction, he could not be released, for he is facing a consecutive sentence for escape. South Carolina law mandates a consecutive sentence for this crime.

**7.** " * * * If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the feder-

al court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits—though of course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing upon the applicant's default. Cf. *Price v. Johnston,* 334 U.S. 266, 291, 68 S.Ct. 1049, 1062, 92 L.Ed. 1356. At all events we wish it clearly understood that the standard here put forth depends on the considered choice of the petitioner. * * * " *Fay v. Noia,* 372 U.S. 391, at 439, 83 S.Ct. 822, at 849, 9 L.Ed.2d 837 (1963).

**8.** The Supreme Court has made repeated references to the finality of criminal judgments in recent years. See, e. g., *Mackey v. United States,* 401 U.S. 667, 690–91, 91 S.Ct. 1160, 1178–1179, 28 L.Ed.2d 404 (1971); *Stone v. Powell,* 428 U.S. 465, 491 and n. 31, 96 S.Ct. 3037, 3051 and n. 31, 49 L.Ed.2d 1067 (1976); *Blackledge v. Allison,* 431 U.S. 63, 83–84, 97 S.Ct. 1621, 1633–1634, 52 L.Ed.2d 136 (1977); *Henderson v. Kibbe,* 431 U.S. 145, 154 and n. 13, 97 S.Ct. 1730, 1737 and n. 13, 52 L.Ed.2d

The first question has been answered by the United States Court of Appeals for the Fifth Circuit in *Strickland v. Hopper*, 571 F.2d 275 (1978). The § 2254 petitioner in that case was convicted of burglary. He filed a motion for a new trial, and escaped after the motion was filed. The trial judge denied the motion on the ground that the movant was a fugitive from justice. After he was captured, the prisoner filed a petition for habeas corpus in the United States District Court for the Northern District of Georgia. He alleged several grounds for relief, including one ground that had been contained in the motion for a new trial. Judge Freeman declined to consider the merits of that claim because it had not been reached by the trial judge in the motion for a new trial due to the movant's fugitive status. The remaining claims were decided by Judge Freeman adversely to the prisoner's contentions. The Court of Appeals affirmed the dismissal of the § 2254 petition, holding that the "petitioner's escape during the pendency of his motion for new trial constituted a deliberate by-pass." The court recognized that "in a very practical sense petitioner knowingly abandoned the privilege of seeking in state court to vindicate his federal claims." It added that Georgia's practice of dismissing a motion for a new trial because of the fugitive status of a movant serves a legitimate concern, and that such a procedural default can be recognized in a federal habeas proceeding.

■ Although the opinion in *Strickland* is relatively brief and to the point addressed, it is highly persuasive. In the absence of any indication that our Court of Appeals would reject its sound reasoning, *Strickland* is considered to be persuasive if not controlling authority to justify a rejection of all federal claims contained in the petitioner's original application for post-conviction relief that he abandoned when he escaped from the South Carolina Department of Corrections. The fact that Judge Baggett reviewed the records and also rejected petitioner's claims on the merits does not alter this conclusion, which affects petitioner's grounds (1), (2), (3), (4), (7), (9), and (10) in his federal petition.[9]

■ Before discussing whether the petitioner's claim of ineffective counsel should be reached on the merits, his federal grounds (6) and (8) may be eliminated. The claim that petitioner did not receive a preliminary hearing is not a federal issue.[10]

---

203 (1977); *United States v. Timmreck*, 441 U.S. 780, 784 and n. 4, 99 S.Ct. 2085, 2087 and n. 4, 60 L.Ed.2d 634 (1979); *United States v. Addonizio*, 442 U.S. 178, 184 and n. 11, 99 S.Ct. 2235, 2240 and n. 11, 60 L.Ed.2d 805 (1979); and *Jackson v. Virginia* (Justice Stevens, concurring), 443 U.S. 307, 319 and n. 12, 99 S.Ct. 2781, 2789 and n. 12, 61 L.Ed.2d 560 (1979).

It is also necessary to keep in mind that "[t]he guilt or innocence of the petitioner is . . . not brought into question by habeas corpus. Only the legality of the detention is relevant. . . . [I]t is altogether possible that a man can be innocent and still be legally detained." Sokol, FEDERAL HABEAS CORPUS (1969), § 2, p. 34. This principle contributes weight to the effect of a felon's escape from lawful custody after he has originated a collateral attack upon his conviction.

9. Petitioner's grounds are: (1) illegal identification and investigation procedure; (2) failure of prosecution to have one investigating officer available to testify at his trial; (3) other persons have confessed the crime for which he stands convicted; (4) error in the exclusion of certain police records during the hearing on his motion for a new trial; (5) ineffective assistance of counsel at trial, on the motion for a new trial, and on appeal; (6) lack of a preliminary hearing; (7) two prosecution witnesses contradicted themselves; (8) Judge Price displayed prejudice against him during the hearing on the motion for a new trial; (9) Judge Price ignored a recommendation by a Greenville County deputy sheriff that he should be granted a new trial; and (10) the State should have corroborated the testimony of the robbery victim as to the hour when other store employees left her alone at the store where she worked as a checkout cashier, and other witnesses should have been called by the State as to the issue of identification of the robber.

The petitioner has jumbled some of his grounds, but all his federal claims except grounds (5) and (6), and possibly (8), are merged into his summary claim in his first post-conviction application that it was error to deny him a new trial.

10. The record reveals that a preliminary hearing was in fact set, but petitioner's attorney concluded it would not be necessary to go into a hearing after talking with two or more investigating officers and the robbery victim in some

*Martin v. State of North Carolina*, No. 76–2073 (4th Cir., September 30, 1976), citing *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975). The petitioner's criticism of Judge Price also does not present a federal claim, and any contention that the petitioner did not receive a fair hearing on his motion for a new trial should have been addressed to the Supreme Court of South Carolina in the appeal.[11] A review of the transcript of the hearing on the motion for a new trial reveals that Judge Price let the petitioner practically retry his armed robbery trial, and the findings and conclusions set out by Judge Price in his Order denying the motion for a new trial are fully supported by the record.

Turning now to the claim of ineffective assistance of counsel at trial, and in all post-trial matters,[12] the court is satisfied that petitioner would have been able to assert his claim of ineffective counsel at trial in his initial post-conviction case if he had not abandoned that case by escaping. A review of many post-conviction hearings has shown that, unfailingly, prisoners have been permitted to raise belated claims during such proceedings so long as the State's attorneys have not been prejudiced in re-

sponding to delayed claims.[13] However, so as to give the petitioner the benefit of the doubt on this vital question, the transcripts of the petitioner's trial and hearing have been reviewed, and such review reveals that petitioner's claim of ineffective counsel is without merit.[14] He alleges that attorney Lynn was ineffective because: (i) he did not file a *Brady* motion; (ii) he failed to request a continuance until a State witness not present for the trial could be located; (iii) he failed to make timely objections; (iv) he talked petitioner into accepting a six man jury that he selected; and (v) he complained because he had not been paid.[15] As to attorney Long, petitioner argues that Long should have contended that Lynn had been ineffective.

There is no showing that the prosecution was in possession of *Brady* material when the petitioner was tried.[16] Although South Carolina courts observed that the "confession" of the petitioner's alleged offense by one Wayne Hughes was not newly-discovered evidence for the purpose of satisfying the South Carolina test to qualify for a new trial, the hearing record reveals that Hughes did not say he committed the crime

---

detail on the day the hearing was scheduled to be held.

11. The transcript of the post-trial hearing is larger than the transcript of the armed robbery trial. Fowler's criticism of Judge Price is strained. He contends that Judge Price told a witness that he did not believe her. This exchange did occur, but its effect on the motion for a new trial is minimal. Fowler states that Judge Price rejected evidence before the Solicitor objected. This, too, occurred, but the judge was rejecting material that was inadmissible, and he clearly explained his rulings during the post-trial hearing.

12. Petitioner expresses his dissatisfaction with not only attorney Lynn, but also attorney Long, who represented him in the motion for a new trial and the ensuing appeal. Essentially, petitioner argues that Long should have argued on appeal that Lynn was ineffective at the trial and in pretrial matters.

13. The court has also observed that attorneys who represent applicants for post-conviction relief have not been reluctant to press claims of ineffective counsel when prisoners have asserted such claims factually.

14. " * * * [E]ffective representation is not the same as errorless representation. An attorney may make a decision or give advice which in hindsight proves wrong. Such errors, as *McMann* [*v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)] pointed out, are not necessarily grounds for post-conviction relief. 397 U.S. at 770–71, 90 S.Ct. at 1448–1449. A convict generally must establish that his counsel's error was so flagrant that a court can conclude that it resulted from neglect or ignorance rather than from informed, professional deliberation. * * * " [Footnotes omitted.] *Marzullo v. State of Maryland*, 561 F.2d 540, at 544 (4th Cir. 1977), *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978).

15. In his argument opposing summary judgment, Fowler widens the range of his criticism of attorney Lynn by detailed criticism of many aspects of the trial testimony, to which he argues his attorney should have made objections.

16. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

for which Fowler was convicted until after Fowler was tried. The failure of Mr. Lynn to ask for a continuance was not ineffectiveness in a constitutional sense. The missing witness, former officer Robert E. Gillespie, could not be located for service of a subpoena on him, and in the context of the evidence that unfolded during the trial, his unavailability did not appear to represent a critical issue.[17] The petitioner's retrospective assessment (in his argument filed in response to respondents' motion) that attorney Lynn was ineffective because he failed to make numerous motions, and express numerous objections petitioner thinks he should have voiced during the trial, simply does not represent a valid § 2254 issue.[18] The issue of a six-man jury is also not a constitutional issue. County courts in South Carolina utilized six-man juries for many years, and a twelve-man jury is not mandated by the Constitution.[19] Finally, the contention that attorney Lynn complained about not being paid is frivolous. Lynn was seeking a ruling on the issue of representation of the petitioner on appeal when he disclosed to Judge Price that he had only been retained for trial, and that he had not been fully paid.[20]

The thrust of the petitioner's whole argument about the alleged ineffectiveness of his trial attorney, and the principal contention he is making here, relates to his identification in court by the victim of the armed robbery. He contends that the identification was tainted by a pre-trial photospread and a pre-trial stationhouse showup, and he fortifies this argument by pointing to the alleged confession of Wayne Hughes that he, and not the petitioner, committed the crime for which the petitioner is under a relatively long sentence. However, the record shows that attorney Lynn labored to show that the victim's in-court identification was unreliable, and was in fact tainted, but failed in his efforts to persuade Judge Price and the trial jury that his argument was valid. Judge Price found that the victim's identification of the petitioner in court was not tainted, and was based on her observation of the robber on the day of the crime. The trial judge was critical of the showup, as well any jurist might be, and he was apprehensive that the petitioner's right to have counsel present when the showup was staged might have been violated,[21] but he concluded that the identification testimony was admissible.[22]

17. As will be observed later, Gillespie showed the robbery victim a photo-spread several days after the robbery. The victim stated unequivocally that her identification of the petitioner in court was based on her close observation of him from three or four feet in distance for about five minutes on the day of the robbery. Thus, although Judge Price expressed concern about the absence of Gillespie [Trial Tr. 43], the unavailability of the former officer, under the overall circumstances, would not have justified a request by attorney Lynn for a continuance of the case.

18. *Cf. Horne v. Peyton*, 356 F.2d 631 (4th Cir. 1966); and *Tompa v. Virginia*, 331 F.2d 552 (4th Cir. 1964).

19. See, *e. g., Williams v. Florida*, 399 U.S. 78, at 86, 90 S.Ct. 1893, at 1898, 26 L.Ed.2d 446 (1970); and *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978).

20. Trial Tr. 124–26. The petitioner's family thereafter retained Mr. Long. Hrg. Tr. 6, *ff.* 5–6.

21. The proscriptions of *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), are limited in application to situations when adversary proceedings against a lineup or a showup subject have begun, and the right to counsel has attached. Identifications made prior to the initiation of adversary proceedings against a suspect must be scrutinized, instead, in the light of the proscriptions of the Fifth and Fourteenth Amendments of identification procedures which are unnecessarily suggestive and conducive to irreparable mistaken identification. *Kirby v. Illinois*, 406 U.S. 682, 691, 92 S.Ct. 1877, 1883, 32 L.Ed.2d 411 (1972); *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *Patler v. Slayton*, 503 F.2d 472 (4th Cir. 1974). In his brief submitted to the Supreme Court of South Carolina (p. 49, n. 1), the petitioner conceded that no Sixth Amendment issue was apparent in the record of his case.

22. Trial Tr. 42.

The extensive record in this case supports Judge Price's findings and conclusions.[23] The trial record reveals that Jordan's Minit Mart, located in the greater Greenville area, was robbed at gunpoint on the afternoon of October 19, 1973. The lone employee in the store was a young cashier, Mrs. Margie Tucker, since other employees had left the store around 3:30 P.M. The robber was alone when he entered the store, and Mrs. Tucker had an opportunity to observe him as he entered the place. He appeared to be a customer. She testified that he went towards the rear of the store as she was putting up cigarettes at the checkout counter. She turned when she heard a footstep behind her, and the robber was loading cartridges into the cylinder of a revolver. The robber took money from the cash register, and forced Mrs. Tucker to also stoop slowly while he held the revolver to her temple as she reached for a bank bag he had spotted on a shelf under the cash register. The robber then forced her at gunpoint to go to a restroom located in the rear of the store. As she moved away from the front of the store, Mrs. Tucker observed a wall clock which registered the time as 3:45. The young woman entered the restroom, as directed by the gunman, and shut and locked the door. Later, after she was satisfied that the gunman had departed, she let herself out of the restroom. As she did so, a young girl came in, and she asked the young customer to go to a nearby home to seek help. The young girl did so, but no one was home at the house. Mrs. Tucker had no change to use the coin-operated telephone at the store, but after a delay of several minutes, she reached the sheriff's office by telephone after obtaining a coin from another customer.

Mrs. Tucker testified at both the trial and the hearing on the petitioner's motion for a new trial. She estimated that she was in the robber's presence for about five minutes. She gave police officers a good description of the robber. She said he was a young white male, 5'7" in height, with thick, reddish-blond hair that extended down to his neckline in a neat appearance, and with a light complexion of somewhat "reddish hue." Although she gave no description of the robber's clothing to the officers, or the color of his eyes, Mrs. Tucker's description of the robber closely matched the petitioner's appearance, weight, and height, according to the trial testimony and other records on file.

Several weeks after the robbery, officer Robert E. Gillespie went to Mrs. Tucker's home to show her a photo-spread which included a photograph of the petitioner. Although she testified at the motion hearing that she made a somewhat tentative identification of the petitioner's photograph for Gillespie, Gillespie (who was not at the trial) disputed this. Some time after the robbery, Gillespie also arranged for Mrs. Tucker to view the petitioner through a one-way mirror in the sheriff's office, and she told Gillespie at that time that the petitioner was the person who had robbed her. Still later, Gillespie and another officer, Charles Driggers, showed Mrs. Tucker either the same or a modified photo-spread, and she identified the petitioner's photograph as being that of the robber. Of principal importance, Mrs. Tucker was unshakeable in her testimony, during both the trial and the motion hearing, that her identification of the petitioner in court as the person who robbed her was based entirely on her view of the robber from a close proximity for a few minutes.[24]

Before Mrs. Tucker identified the petitioner during his trial, attorney Lynn obtained a hearing on the identification issue outside the presence of the jury. Although Judge Price, as earlier stated, was impliedly critical of the officers who ar-

---

23. *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

24. The young woman said that at one point she was "staring him right in the face because [she] thought he was kidding" when he said he was robbing the store. [Trial Tr. 48, f. 23.]

She said that she was only accommodating the officers when she viewed photo-spreads and the station showup, and implied that these incidents were unnecessary to her positive identification of the petitioner. [Trial Tr. 75–77.]

ranged the pretrial identification efforts, he based his ruling as to the admissibility of Mrs. Tucker's identification testimony on her steadfast position that her testimony was based on what she observed during the robbery, and not on what she saw later.

The petitioner defended on the basis of an alibi. He testified that he worked at Woodside Mill at Greenville on the day of the robbery, on a shift that commenced work at 4 P.M. His wife corroborated the alibi. Attendance records of that textile plant showed that petitioner did work that shift on that date, but the evidence was clearly susceptible to a finding by the jury that he could have robbed Mrs. Tucker and still arrive at the Woodside plant by 4 P.M.[25] The petitioner's alibi was blunted substantially by Mrs. Tucker's unequivocal identification testimony, and her observation of the time when she started walking to the restroom after the store's money had been seized by the robber, as well as by the reasonably close proximity of Jordan's Mart to the mill.

The hearing on the petitioner's motion for a new trial substantially turned on the testimony of Wayne Ray Hughes, his wife, and Mrs. Tucker. Hughes was charged with a series of armed robberies. He told Greenville officers following the petitioner's trial that he robbed Jordan's Mart. However, his testimony was substantially lacking in credibility,[26] and his account of the crime varied in two or three material particulars from the account stated by his wife, who allegedly participated in the offense.[27] With both the petitioner and Hughes in court, Mrs. Tucker again testified that it was the petitioner, and not Hughes, who robbed her,[28] and that although a picture of Hughes had been in a photo-spread she viewed, she had never seen him prior to the hearing.[29] In view of all the evidence he considered and the testimony he heard, and notwithstanding a recommendation by one officer that the petitioner ought to obtain a new trial based on the vague confession of Hughes, and the coincidences of other crimes committed by Hughes,[30] it is not possible to state that Judge Price denied the petitioner a full and fair hearing, or that his findings and conclusions are not reliable and correct under controlling federal constitutional principles. *Townsend v. Sain, supra.*

In spite of officer Gillespie's clearly improper showup ruse, and in spite of the conflict in testimony about whether Mrs. Tucker made a tentative identification of the petitioner when she first viewed a spread of photographs shown to her by Gillespie, the determination of the identification issue by South Carolina courts cannot be upset here under 28 U.S.C. § 2254. The positive and unwavering identification of the petitioner in court by Mrs. Tucker as the armed robber withstands critical judicial scrutiny under the totality of all the

25. Jordan's store is about two miles from Woodside Mill. [Trial Tr. 72.] The mill did not use a time clock to record hours worked. A shift supervisor logged in employees at work by hand, and these handwritten entries were transposed for payroll purposes. Testimony revealed that an employee would be "docked" in increments of one-quarter hour if he or she reported for work late. During the motion hearing, the petitioner's wife's attendance record was also introduced. Judge Price made it quite clear that he did not place an imprimatur of infallibility on such records. [Hrg. Tr. 54–55.]

26. Hughes insisted that he robbed the place, but he could not recall details of the offense that the robber would be reasonably expected to know. He recalled there were customers in the place, and he could not recall whether he robbed a man or a woman.

27. As Judge Price observed during the motion hearing, Mrs. Hughes was painstakingly careful to make it clear that if she should be brought to trial, she was acting under duress applied by her violent husband.

28. Hrg. Tr. 183.

29. *Id.*, at p. 188. There are no similarities at all between the physical appearances of the petitioner and Hughes, according to the records on file herein. · Hrg. Tr. 66, Defendant's Exhibit 9.

30. Hughes was under sentences for a robbery and rape in York County when he testified. As Judge Price pointed out, he denied his guilt of that offense while admitting he committed others for which he had not been tried.

circumstances reflected in this record, and meets all elements of the totality-of-circumstances test except one, the time elapsed between the crime and the initial confrontation. See *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *United States v. Wade, supra,* 388 U.S. at 241, 87 S.Ct. at 1939; *Manson v. Brathwaite, supra; Johnson v. Riddle,* 562 F.2d 312, 315 (4th Cir. 1977); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Stanley v. Cox,* 486 F.2d 48 (4th Cir. 1973), *cert. denied,* 416 U.S. 958, 94 S.Ct. 1975, 40 L.Ed.2d 309 (1974); and *Ghiz v. Bordenkircher,* 519 F.2d 759 (4th Cir. 1975), *cert. denied,* 424 U.S. 944, 96 S.Ct. 1413, 47 L.Ed.2d 350 (1976). Therefore, the petitioner's contention that he has been convicted on the basis of an erroneous identification does not entitle him to federal relief. This court has studied the record closely, because a person's conviction based on the identification of a single eyewitness deserves such close security.[31] Moreover, the failure of the prosecution to call the young girl who allegedly saw the robber fleeing the scene as a witness during the petitioner's trial does not affect this conclusion, for Judge Price's holding on this issue [32] is not reversible here under § 2254.

The review discussed also prompts the conclusion that Mr. Lynn's efforts in behalf of the petitioner fully met the standards by which the competence of a defense attorney must be judged. *Marzullo v. Maryland, supra.* It naturally follows that Mr. Long cannot be criticized justifiably by the petitioner merely because he did not raise an exception of ineffective assistance of counsel at trial when the petitioner's conviction was appealed.

To give the petitioner the benefit of any doubt as to whether his claims barred as a result of his escape should be foreclosed from any further review, the court has reviewed the record to determine whether

the jury which found him guilty of armed robbery exercised rational judgment. It is clear beyond doubt that the record, viewed in the necessary light that is favorable to the prosecution, establishes that a rational factfinder could have found petitioner Fowler guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Based on the foregoing authorities, the petition must be dismissed,

AND IT IS SO ORDERED.

---

**31.** This is not to imply that an identification by only one eyewitness is insufficient. See *Neil v. Biggers, supra.*

**32.** See pages 16–17 of Order dated October 3, 1974 in Transcript of Record. This young girl's

comments to officers during the immediate flurry of investigative efforts, whatever her comments were, would not constitute *Brady* material.